The next argument is an appeal to 2007-1992, UK Senate Bill. Good morning, Your Honor. The board's decision should be overturned in this case because its conclusion that programmed protein is nearly descriptive of Centocor's medical research services is not supported by substantial evidence. What's insubstantial about the evidence? Engineering definitions, numerous usages in various texts in the field, but quantity in both categories. How is that less than substantial? For a number of reasons, Your Honor. First and most fundamentally, there's no such thing as a programmed protein. Centocor does not make programmed proteins. We all understand that. That's not complicated science. We program the DNA, but the DNA, through RNA, programs the protein. So, kind of loose. Again, Your Honor's question gets to the question that really the issue here is where the mark falls in the continuum of descriptiveness versus suggestiveness. We don't dispute that the mark has suggestive connotations, but the question is whether it's nearly descriptive. It's been found by the board and the examiner, all four unanimously, to be nearly descriptive. And I don't understand your theory of why that has to be wrong, other than you mouth the phrase that the evidence is insubstantial. Well, I think the starting point has to be the evidence itself that the board relies on. And that's what caused me to say that there is no such thing as a programmed protein, because the evidence that the board relies on is flawed. And we've tried to take great care to go through this one by one in our brief, looking at each individual piece of evidence. And I submit that a careful look at that evidence demonstrates that each individual piece… And we want it read a certain way. If the board read it in the contrary way, it seems to me that unless you can show us that the inferences that the board made from the unarguable text were unreasonable inferences, you can't prevent it. In fact, we submit that… What's unreasonable about the interpretation of those various texts that the board unanimously arrived at? Because looking at each individual text demonstrates that the term… One, that the term programmed is not modifying the term protein by itself. And secondly, that the unitary term programmed protein is not used in a descriptive sense as to any medical research services. There are no examples. It's not simply a matter of how it's cast. Looking at these individual pieces of evidence objectively, there are no individual pieces of evidence which can be fairly construed under a substantial evidence standard as supporting the inference that programmed protein or the programming of proteins is out there in the common lexicon. And when we apply this… If it's not the common lexicon, it would be closer to generic on a slight scale. When we're looking at descriptiveness, are these the words that your competitors are going to have to use when they compete with you? And isn't it true if we're talking about computer resources analyzing DNA leading to proteins, programmed and protein are going to have to be a significant part of any description? I would agree with the court's first statement that a critical part of the analysis is to look at the underlying purpose of what a 2-v-1 refusal means. That is, are these… The crux of the test is, are these terms that for which it would be unfair to allow one particular party… …to have an outlay on language which may be necessary for competitors. Right. And under the substantial evidence test, where it's here, there is no evidence of any commercial usage of programmed protein or programmed modifying protein. And given that CENTCOR's research services on the unrebutted record are novel, then really it's just left to pure and raw speculation and guesswork for the board to presume that perhaps somewhere down the line someone may want to use these words. I don't see how you're answering Judge Reeder's question. Why won't all the competitors who may arise in the future need to use this kind of language? Well, I mean… How can they avoid using this language? Because there's no evidence that programmed is used to modify the term protein. And to suggest that they may want to later on is to make… Well, that's not the question. The question is, won't they have to use this kind of language? Because it's the only way you can fairly describe what the service is. So anybody else who's a competitor offering the same service will need to use the equivalent language, if not this precise term. Absolutely not. Because again, CENTCOR's not programming proteins as we know them. You program DNA. Correct. And you program the computers that analyze the DNA. Right. But still, that's your programming. They're programming, and the ultimate result is proteins. Aren't those words pretty inextricably tied to your service at several levels? At the level of the DNA, and at the level of the protein, at the level of the computer, and the computer's biological outputs. Well, we're not seeking to register programmed protein for the good of DNA molecules. We're not seeking to register programmed DNA molecules. I mean, since the mark itself requires an inference, and when you look at it from the perspective of an… Well, you say that. George Madden didn't require inferences. It was immediately apparent what it meant. They did indeed include that, and there's simply nothing in the record to support that. It's speculation. Why didn't Judge Rader's question illustrate how it's exactly solved? Well, I mean, I… Describe your product without the language programming proteins. Program or proteins. Well, Centifor produces… I mean, its libraries involve coded molecules, which are then used to assemble genes, which are then, in turn, expressed in proteins in host cells. You've used a lot of synonyms for programmed and synonyms for proteins. And why should we give you an exclusive right to be the most logical one of the terms describing those synonyms? We don't dispute that a component part of Centifor's programmed protein libraries is DNA molecules, which can fairly be said to be programmed. So really the question is, is given that DNA molecules are… DNA, in a sense, programs the protein via the RNA process. I mean, there's a lot of… Right. There's a lot of wonderful inferences in this language, but they all come back to those two words. Right. But I guess what I want to focus on is my concurrence to your argument of the word inferences. That's the crux of the imagination test when distinguishing between a descriptive mark and a suggestive mark. That is, is the connection between the mark… Why are some inference, some thought, some measure of the imagination? And I would submit that in a situation like here where we can agree that we're speculating, frankly… But when there are so many connections at some points, the board tells us it becomes an immediate recognition. And it's descriptive. If that is the case, then yes. If there's an immediate descriptive recognition of those terms, then that's true. But when we look at programmed protein in relation to the services at issue here, there's nothing about the mark, which immediately when one sees when a likely purchaser educated in the biosciences, there's nothing about that that's going to make them immediately think of the fact that the services involve DNA, synthetic DNA. I mean, they may view this mark and they may perceive the programmed component to be referring to the naturally occurring biological senses. Well, they would because they're in the market to buy a service. It's out there in nature. They don't have to buy it through the Senate or anybody else.  You're acting as if this is some kind of abstract linguistic exercise divorced from reality. This is commerce. We're talking about the prospective buyer looking for this kind of service would think when reading the mark, programmed protein. He would immediately think just what Jeff Rader was suggesting. You can say over and over and over that he wouldn't. But there's no evidence suggesting that he wouldn't. Did you have survey evidence to counter the examiner and the board's conclusion? There's no survey evidence, but the crime facing burden falls on the board to establish that. We know where the burden falls. It looks to me like they amply carried it and your rebuttal was zero. I'd say lots of clever things about how the programs aren't. Zero reality is not directly of the protein. There's been extensive evidence that was marshaled forth by both parties. Exhausted searches of Lexus databases and Google searches and with looking at all of those materials produced by both parties, the most that can be come up with is two or three indirect references to programmed modifying protein. I want to emphasize that we're not asking the court to permit registration. All we're asking is that the mark be published for opposition. I would submit that in a case like this where we're engaging in some guesswork as to what competitors may later want to use, it's those competitors who are best situated in a situation like this to indicate whether they may be damaged or whether this is an issue of concern for them or whether they may well want to have programmed protein as a descriptive term that ought to be part of the common lexicon. The logic of that is that the office should allow every application for it to go to publication and rely only on the opposition procedure. We all know that's not at all the law. We're certainly not arguing that that's a uniform application. I'm arguing that that's the case here, number one, because there's no evidence of any descriptive use of this term. There's not many cases that are going to come before the board where they can't point to any actual descriptive use of the term. There are innumerable instances of descriptive use of each of the two terms. It may be true that the two terms together in the sequence of the application mark doesn't show up in any significant way in all that literature on both sides of the map, but there's lots of descriptive quality to each of the two terms, I think, undeniably. I don't see how you get around that. Again, I would point to what this board has pointed to as its anti-dissection policy in that the mark must be construed as a whole. I don't think that protein is construed as a whole. You have to start somewhere. You start with the parts, and then you see if the combination makes some change. The board did that analysis. There's no change from the natural inferences of each of the two words. The board did, indeed, do that analysis. But the crux of our position is that their position must be based on substantial evidence. And here, since the evidence that they are relying on we submit is item by item, there's no evidence of descriptive use. That leads us to mere speculation as to whether it will later need to be used. And that's something that ought to be resolved under the board's opposition procedures as opposed to up front. I'm eating into my rebuttal time. All right. Thank you. From the Pat Jones. Beaver? Welcome. Please proceed. May I please support? I have a lot too much for me to say on the merits of the case. We submit there is more than substantial evidence here to support the board's conclusion that protein really describes. Medical research services related to DNA and gene synthesis. How about counsel? A lot of these pieces, individual pieces of evidence. It seems to me like the examiner just blindly searched for programs near protein. It doesn't actually have anything to do with services. Completely out of context in a few instances. I'm really, this is, it's disappointing to see the way that was done. There are many instances where the terms are used in the same way that senate board is using them. Senate board's business plan discusses how it produces proteins from programmed DNA. The closest ones are 3, 4, and 5. And those are talking about natural DNA, not synthetic. So even with the closest ones, you have to make some inferences. Which I think plays right into what Judge Moore is saying. It's not right on point. It seems like a computer search where you entered program and protein for Google and came up with 25 instances. Not a careful descriptiveness analysis. In the context of the products actually on which the trademark would be utilized. Well, there are several examples and it's important to keep in mind that the relevant purchasers here are those who are educating the biosciences, working in the medical research field. These abstracts and articles are all geared to and read by those same types of people. And it uses the terms protein. The very first article cited by the board, as though it provides great authority for this decision, says that it's actually referring to the program degradation of a protein. You agree that's completely different than the service that they're attempting to get this trademark for, correct? That is different from the service, but it shows how the terms programmed and protein are used in the biosciences and what they convey. So the programmed degradation of a protein, how is that similar to the use of programmed protein for these particular services? You're right, it does convey how the words programmed and protein are utilized together in at least one article. It doesn't seem to be utilized in a way that's at all relevant to their services. I agree with you that in the degradation context it's not particularly relevant, but we do have examples, several, like according to A110 of the 2005 Townsend letter. It's talking about genes programming proteins. That's what Cetacor does. The CFTR protein programmed by this gene is a quote. Are you talking about the Townsend letter? Yes. Then there's another reference, the immune system programming proteins. It's at A110 to 111. It's a 1994 article in Science Magazine. I quote, the ability of the immune system to yield binding proteins programmed to interact in highly specific ways. At A111 to 112, it's a 1987 article in Science Magazine talking about bacteria programming a protein. At A113, it's an article title, and it's talking about RNA programming the production of proteins. Just what Cetacor does. All of these uses show the same types of uses. Not identical, not the exact phrase programmed protein together, but that's not what you have to show. You need to show what is the relevant public here, those educated in bioscience, is likely to perceive this combination to mean in the context of Cetacor's very broad idea, which is medical research services relating to DNA and gene synthesis. It doesn't matter that they do it synthetically. It encompasses both the naturally occurring and the synthetic process. And the business plan is highly illustrative of what the relevant consumers are going to perceive because it says themselves, they describe their technology as a protein programming technology. At A29, it's in bold text in the first sentence, repeated again at A31. At A30, they talk about how in their achievements, they've produced libraries of more than a million programmed proteins. They themselves are using this term descriptively to describe exactly what they're producing. We submit that this evidence, the business plan, is highly relevant, as is the dictionary definition, that you have a direct meaning in the biosciences field as to what people are going to perceive the programmed aspect to mean. And taken together, the board correctly concluded these terms do not convey any more related to some of their descriptive parts. So, counsel, let me make sure I'm understanding your argument. It's that if we look at just the business plan, the context, or understanding of the average purchaser, and the dictionary definitions of programmed protein individually, that that alone is substantial evidence, even if I were to determine that all of the articles were erroneous. We submit that it's – there's just one other point that I would like to make as well. Why wouldn't we just let this go to opposition and see if there's a community out there that needs to use these terms? Well, that's not what we do. We – this is not a case where it's compelled to be generic. This is a case where we're finding that it's descriptive. It's incumbent upon set to court to come forth with evidence that the public actually perceives it as being a source identified for their services. And if they're able to do that, at some point down the road, as an attempt to use application, they may well be able to get benefits of protection on principal register. But at this time, it's descriptive language, just as you suggested earlier, that if there's nothing imaginative about you have – the product is proteins, and programming is the means by which they're created. And while there may be some intervening technological steps, there's not intervening steps in the mind in terms of what you're getting. It tells you what you get and how it's made. You wouldn't register, for example, handmade furniture for, say, woodworking services. It's telling you that the product isn't how you make it. It's exactly what set to court's work does here. It's descriptive. And so we will not take out of the public domain what are the apt descriptive terms for what the product is. Anything further? I do not. If you don't have any further questions, we'll rest on our briefs. Thank you. Mr. Goldman? Do we have a minute? Fifty seconds? Thank you. Appreciate your points. We don't dispute that in this field that one is apt to see the term program and protein often occur somewhere in the context of the same sentence, whether naturally or otherwise. But that's very different from any indication of the term program modifying protein by itself. There is no evidence, and the record has illustrated that. The Townsend letter probably comes the closest. But even that, it's an individual letter from an individual doctor. No indication it's been peer reviewed. What about the business plan? I'm sorry? What about the business plan? The business plan, first of all, it's inaccurate to characterize the business plan as in any way indicating that we use the word program to modify protein. In each instance, we do use program to modify to describe what we're doing to the DNA molecules. We don't dispute that. We are, in fact, synthesizing, coding, programming DNA molecules. But that's very different, and there's many cases from this court and the board in which the mere use of the term on a component part, for example, in the DeRafe case using cultured for pancake mix in which cultured milk fat was an ingredient, that may be descriptive of an ingredient, but it's not descriptive overall. And the same effect is the sugar and spice case from colonial stores. Sure, sugar and spice may well describe ingredients in bakery goods, as in that case, but that doesn't mean that the mark taken as a whole is descriptive, merely because it may make some allusion to a component part. What about your descriptive uses of the term in your business plan? Our only descriptive use of program is to modify molecules, where the terms program and protein are used together. It's capitalized with the TM symbol. There's no descriptive use. If you're using programming, then, of course, the protein's a molecule. So, I mean, you'd use, again, a different term. Why aren't you using those terms somewhat descriptively? We are using program descriptively of DNA molecules, what we're doing with them, but there's nothing in the business plan which illustrates descriptive use as to proteins themselves. All right. Thank you.